IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL L. OWENS,

       Petitioner,             No. CIV S-04-2415 GEB GGH P

   vs.

D.L. RUNNELS, et al.,

       Respondent.       FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

      Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction for two counts of first degree murder, one count of first degree burglary and two counts of attempted robbery.  Petitioner was also found to have personally used a firearm and as to the murder counts, that he committed the murders in the course of a robbery and a burglary.  Petitioner was also found to have a prior felony conviction for robbery.  Petitioner was sentenced to a determinate term of 79 years and an indeterminate term of life without the possibility of parole for the murder counts, doubled under the Three Strikes law.

      This action is proceeding on the first amended petition filed August 29, 2005.  Petitioner raises the following claims: 1) ineffective assistance of counsel; 2) jury instruction

1

1  error; 3) improper admission of character evidence.  After carefully considering the record, the

2  court recommends that the petition be denied.

3  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

4          The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

5  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

6  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

7  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

8  standards of review to be used by a federal habeas court in assessing a state court's adjudication

9  of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

10  (9th Cir. 1997).

11          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

12  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

13  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

14  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

15  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

16  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

17  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

18  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

19          "Unreasonable application" of established law, on the other hand, applies to

20  mixed questions of law and fact, that is, the application of law to fact where there are no factually

21  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

22  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

23  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

24  deference is not blindly automatic, "the most important point is that an *unreasonable* application

25  of federal law is different from an incorrect application of law....[A] federal habeas court may not

26  issue the writ simply because that court concludes in its independent judgment that the relevant

1    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

2    that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

3    1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

4    objectively unreasonable nature of the state court decision in light of controlling Supreme Court

5    authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

6            The state courts need not have cited to federal authority, or even have indicated

7    awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

8    Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

9    contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

10   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

11   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

12   established Supreme Court authority reviewed must be a pronouncement on constitutional

13   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

14   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

15           In reviewing a state court's summary denial of a habeas petition, this court must

16   "look through" the summary disposition to the last reasoned decision.  See Shackleford v.

17   Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000)(citing Ylst v. Nunnemaker, 501 U.S. 797, 803-

18   04, 111 S.Ct. 2590 (1991)).

19           However, where the state courts have not addressed the constitutional issue in

20   dispute in any reasoned opinion, the federal court will independently review the record in

21   adjudication of that issue.  "Independent review of the record is not de novo review of the

22   constitutional issue, but rather, the only method by which we can determine whether a silent state

23   court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

24   2003).

25           Petitioner raised his claims alleging jury instruction error and improper admission

26   of evidence in his direct appeal.  Only the California Court of Appeal issued a reasoned decision

denying these claims.  Accordingly, the court considers whether the denial of these claims by the California Court of Appeal constituted an unreasonable application of clearly established Supreme Court authority.  Petitioner raised his ineffective assistance of counsel claims in his habeas corpus petitions filed in state court.  Only the Superior Court issued a reasoned decision addressing these claims.  Respondent's October 28, 2005, lodged document no. 6.  Accordingly, the court considers whether the denial of petitioner's ineffective assistance of counsel claims by the Superior Court was an unreasonable application of clearly established Supreme Court authority.

III.  Background

The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

> The prosecution alleged: Defendant and codefendant Leon Lampkin (whose trial was severed from defendant's) invaded the home of Alejandro and Leoncio Jimenez, whom they believed to be drug dealers, to rob them.  A gun battle ensued inside the house.  Defendant fatally shot both victims, but was shot three times himself.  Defendants escaped the house; Lampkin got away, but defendant made it only to the street, then collapsed.

> Defendant did not testify, but presented a defense claiming total innocence.  On defendant's scenario, he happened to walk by the victims' house at the wrong moment, got shot through the open front door, and fell where he was shot.

> Prosecution Case

> *The crimes and their investigation.*

> As of March 18, 1998, the date of the crimes, Alejandro Jimenez, his brother Leoncio, and Alejandro's 18 year old daughter Marisol lived at 6106 Alpine Way in Linda, California.  Marisol assumed her father was a drug dealer because he always had a lot of cash, people were always coming and going at the house, and people who arrived empty-handed left with packages.

> On or before March 17, 1998, Marisol found $4500 in cash on the kitchen table and took it.  She visited her friend Crystal Barden, who lived at an apartment complex called Countrywood Apartments, and told Crystal and others, including Crystal's sister Amber and Crystal's boyfriend, Tony Burgos, about the money. [Footnote 1]

[Footnote 1: Codefendant Lampkin also lived at Countrywood Apartments with his girlfriend, as did Stacie Tugend, the sister of one of defendant's ex-girlfriends.  No direct evidence showed how defendants became aware of the Jiminez brothers, but the jury could have inferred that some indiscretion from Marisol's circle filtered back to defendants.]

Marisol spent most of March 18, 1998, on a shopping spree in Marysville and Sacramento, among other things using $2900 of the purloined cash to buy a car for her boyfriend Michael Daehn.  She returned home around 10:00 p.m.

Pulling into the driveway and looking toward the open front door, Marisol saw a Hispanic appearing man in the entryway holding a gun to her uncle's head. [Footnote 2] The gunman shut the door.  Marisol drove to a friend's house nearby

[Footnote 2: Shown a photo of codefendant Lampkin during trial, Marisol testified that he had the same skin color as the man she saw, but she could not positively identify him.]

and called 911, stayed on the line until she heard sirens, then walked half way down the street with her friends. [Footnote 3.]

[Footnote 3: Marisol admitted that in interviews with the police she had given accounts which differed in some details from that which she was giving now, but she was confused, upset, and afraid at that time.]

Martin Dunn, who lived at 6076 Alpine Way, heard gunfire sometime around 10:00 p.m. Going outside to investigate, he heard someone asking for help.  He walked over and found defendant lying on the side of the road, bleeding from his legs.  Dunn told his girlfriend to call 911.

Mary Scales, who lived on the street behind Alpine Way, heard three popping sounds around 10:20 p.m., followed by glass breaking.  Looking outside, she saw a man jumping a fence near her house.  He was wearing a hooded sweatshirt and holding a wooden object.  He appeared to be around 5 feet 10 inches tall and thin; he could have been Hispanic. [Footnote 4.] He was apparently trying to hide in the shadows.

[Footnote 4: Like Marisol, when Scales was shown photos of Lampkin she said he had the same skin color as the man she had seen, but she could not identify him.]

Officers from the Yuba County Sheriff's Office quickly responded to the 911 dispatch.

The first officer on the scene, Sergeant Long, arrived at 10:19 p.m. and found defendant prone on the roadway of Alpine Way.  Martin Dunn told Long that defendant had been shot.  When Long questioned defendant, he appeared to be in pain, but not so much that he could not respond; however, he did not answer Long's questions about what had happened and how he had gotten shot.

/////

An ambulance arrived soon after.  When the emergency medical team rolled defendant over, they found a .45-caliber bullet on the roadway.  They took defendant to the hospital where he was operated on. [Footnote 5.]

> [Footnote 5: The operation included the removal of a .45 caliber bullet from defendant's body.  Defendant had been shot in both legs and in the abdomen.  He also had a stress fracture in his left tibia running down from an entrance wound, and a transverse fracture in his left leg, most likely caused by walking or running on the leg after he was shot.]

Deputy Houston also responded to the dispatch call.  When he arrived, Sergeant Long asked him to take control of the crime scene. [Footnote 6.] His attention was

> [Footnote 6: At around 10:45 p.m. or 11:00 p.m., Houston yielded control to Sergeant Marusin, who had just arrived.  Sergeant Marusin took charge of the investigation thereafter.  Sergeant Marusin went through the house a couple of times alone.  He then decided to get a search warrant rather than to continue to rely on Marisol's consent to search because his superior officer realized that Marisol might be a suspect.  He resumed the search, in the company of criminalists, around 6:00 a.m. on March 19, after obtaining a warrant.]

directed to Marisol.  Crying  hysterically, she told him what she had seen and gave him her house keys.  She also told him that she could not tell whether defendant was the man she saw inside the house.

Houston went to the house, pounded on the front door and yelled "Sheriff's Department," but got no response.  The door was locked.  He opened it with the key and entered with another officer.

In the living room Houston found one victim, later identified as Leoncio Jimenez, lying supine with a bullet wound in his sternum; a .45 Colt semiautomatic pistol lay at his feet, the slide locked back and the magazine empty.  In the passageway between the living room and the kitchen was another victim, later identified as Alejandro Jimenez, lying on his side. [Footnote 7.]

> [Footnote 7: A black knit stocking cap lay near Alejandro's knees.  Two hairs found on the cap were collected for DNA analysis, but it could not be done because the roots were missing.  The hairs appeared straight and brown.]

Each victim had about $5000 in cash on his person.  Emergency medical technicians, arriving at around 10:40 p.m., confirmed that the victims were dead.

Houston found numerous shell casings on the floor of the kitchen and living room.  A criminalist later determined that three were .45 caliber and nine were nine millimeter.

Testing by Don Dunbar, a criminalist and firearms expert, disclosed that the .45-caliber casings came from the Colt semiautomatic pistol found by Leoncio's body, and the nine-millimeter casings came from a Ruger semiautomatic pistol which

6

the police found on the front lawn of the victim's house on the night of the crimes. The ruger was identified by its serial number as a gun which Melanie Tugend and Maurita Gilmer bought for defendant in August 1997, paying in cash, after he had picked it out at a store.  Autopsies of the two victims revealed Leoncio died as a result of a gunshot wound to the heart.  Alejandro had multiple gunshot sounds to the chest and aorta from defendant's nine-millimeter pistol.

Dunbar opined that both the bullet found on the street when defendant was moved and the bullet surgically extracted from him came from the Colt found by Leoncio's body.  (The police later discovered a Star .45 caliber pistol in the bedroom of the victims' house, but the expert opined that the bullets and casings could not have come from that gun.)

A shotgun blast had damaged the ceiling of the back bedroom and laundry room. There was a spent shotgun shell on the floor and old shotgun wadding on the floor near the kitchen/garage door.  A hole in a pocket door between the laundry room and kitchen matched the holes in the ceiling.  The walls of several rooms contained bullet holes and expended bullets.

A back window was broken, with shattered glass on the ground underneath.  The window frame and the broken glass had blood droplets on them.  Sergeant Marusin concluded that someone had escaped the house by jumping out the closed window.

A sliding glass door leading from the backyard to the dining room was open and intact.  No blood was found in the back yard or on the porch beside the glass door.

Outside the house, at its northeast corner, the police found two black backpacks, one made of leather and one of nylon.  (Melanie Tugend testified that they resembled backpacks she knew defendant to own in 1997.)  One contained duct tape, a baseball cap, and two 20-gauge shotgun shells; the other contained duct tape, a latex glove, and a magazine with live round of nine-millimeter Winchester ammunition, fitting the gun found on the lawn.  The inside of the latex glove bore one fingerprint, which a latent prints analyst identified as a match for defendant's. [Footnote 8.]

> [Footnote 8: No fingerprints of defendant or DNA evidence pointing to him were found in the house.  However, his prints were found in his mother's Cadillac and on the manual for a nine-millimeter Ruger in a locked file cabinet at the home of ex-girlfriend, Charlene Harden.]

In the area where defendant had been lying, the police found two bloodstained T-shirts, a pair of brown cloth gloves, and a pair of glasses.  A large pool of blood lay in the roadway.  A blood trail led from there a few hundred feet to the end of the victims' driveway.  No blood drops were found between the end of the driveway and the house, or anywhere else in the exterior crime scene. [Footnote 9.]

> [Footnote 9: Don Dunbar opined that someone shot at close or intermediate range with a .45 caliber would not necessarily be incapacitated immediately and might be able to move some distance

7

before starting to lose blood.  Thus, the beginning of a blood trail did not necessarily show the victim's location when hit.]

In front of a house about 400 feet west of the backyard of the victims' house, the police found a sawed-off shotgun and a claw hammer in the shrubs.  The shotgun had an expended shell in the chamber of the same type and color as the shells found in the backpacks.  The shotgun and hammer bore bloodstains.

DNA testing on blood samples collected in the investigation indicated that defendant was the source of all blood found on the street, but not of the blood found on the window frame, the broken glass, the shotgun, or the hammer.  All of those blood samples could have come from codefendant Lampkin.

A Cadillac belonging to defendant's parents was parked in the driveway of a nearby house not visible from the crime scene.  The officers had to get the keys to the car from defendant's mother.  On searching the impounded car, they discovered a key ring on the front passenger seat.  It held keys that opened the door of codefendant Lampkin's residence and operated his car.

A few days after the crimes, defendant's ex-girlfriend Charlene Harden and her friends Rebecca Smith and Mary Gorham forced open a locked file cabinet belonging to defendant which was stored in Harden's bedroom.  It held several types of ammunition, a box and an owner's manual for a nine-millimeter Ruger pistol, two ski masks, and papers bearing Melanie Tugend's name.  Harden asked Smith and Gorham to dispose of the material.  Instead, they stored it on Gorham's premises.  Harden eventually brought the police over to retrieve it.  Defendant's fingerprints were on the Ruger owner's manual and the police found purchasing documents for that gun at Tugend's residence.

*Defendant's associations and activities.*

Defendant knew codefendant Lampkin and Melanie Tugend from high school in the early 1990's.  Tugend became his girlfriend for a number of years.  When defendant would come over to stay the night with Tugend, he would bring belongings in one of two black backpacks, one made of leather and the other of nylon.

Tugend saw defendant and Lampkin together once in 1997.  Lampkin was around five feet nine inches tall and light skinned; he looked Hispanic and black.  His girlfriend Rebecca lived in the Countrywood Apartments.  So did Tugend's sister Stacie.

In August 1997 defendant took Melanie Tugend shopping for a gun.  After he picked out the model he wanted, a nine-millimeter Ruger semiautomatic pistol, she and Maurita Gilmer went back to the store, filled out the paperwork, and bought the gun.  Tugend took the weapon, its box, its operating manual, and some shells and put them in a closet to which only she and defendant had keys.  In November 1997, after defendant and Tugend had broken up, he retrieved these items from the closet.

/////

In September 1997, defendant moved into an apartment with Maurita Gilmer. [Footnote 10.]

[Footnote 10: Gilmer and defendant married in May 1998.]

They paid rent on time through November, but were late every month afterward until March 1998 and bounced a rent check in February 1998. On March 12, 1998, a week before the crimes, they received a three-day notice to pay or quit.

On March 18, 1998, in the later afternoon, defendant visited Stacie Tugend at Countrywood Apartments. After staying a short time, he said he was going over to see if Lampkin was out of the shower.

Shortly after 7:00 p.m. on March 18, the phone rang at defendant's home. Gilmer answered. The speaker identified himself as "Leon." Gilmer did not know him. She knew a friend of defendant named Leon Kage, but he was not the caller. The phone rang again a bit later; this time, defendant answered. He told Gilmer he had to pick "Leon" up. He said he would be right back, then left in his father's white Cadillac.

Around 8:00 p.m. on March 18, defendant stopped in at the home of Orlin Stearns and Cookie Saunders, which is on Shasta Way near the intersection with Alpine Way. Charlene Harden, the mother of defendant's young son, was there. Defendant asked Harden to go with him; they left together.

Defendant, who was driving a Cadillac with a light-skinned male passenger Harden did not know, told her he needed to pick up something near her residence. Harden drove home. Defendant came by around 8:15 p.m., carrying a black nylon backpack. He went into Harden's bedroom, where a locked filing cabinet was stored to which he had the only key. He came out five minutes later with his backpack. He left around 8:45 p.m.

Around 10:00 p.m., defendant returned to the Stearns's house and asked if he could park his Cadillac in the driveway. He promised to come back and get it quickly. Stearns said it was all right. (The car was still parked in the driveway at 1:30 o'clock the next morning, after defendant had been taken to the hospital.)

Defense Case.

Gene Stober, a former narcotics investigator for the Yuba County Sheriff's Office, testified that Marisol's account of her father's and uncle's activities was consistent with small-scale drug dealing. Six years before trial, Alejandro's name had come up in a peripheral manner in a cocaine investigation; no evidence suggested that he was part of a drug cartel. Stober had never heard of Leoncio.

During the prosecution's case-in-chief, Sergeant Marusin testified that the officers initially considered persons other than defendant and codefendant as suspects, including Marisol (because of her theft), her boyfriend Michael Daehn (who was of Asian descent but might have looked Hispanic to some people, and who did not get along with Alejandro), and Joseph Leon, a known acquaintance of defendant who could have been the "Leon" who called defendant's home on the night of the

9

crimes.  However, all were excluded at an early stage of the investigation.
Marusin never thought that the killings could have been in retaliation for the
victim's drug activities.

Gunshot residue (GSR) testing is done to determine whether the person tested has
fired a particular gun or has been in the vicinity of a gun that was recently fired.
The officers did GSR testing on Marisol, Daehn, Crystal Barden, and Tony
Burgos, among others.  The officers brought a GSR kit to the hospital to test
defendant, but it was not done because he was in surgery and the officers thought
it useless to do the test after that.  Sergeant Marusin decided not to do a GSR test
on defendant's clothing because he thought he already had better evidence relating
to firearms, bullets, casings, and ballistics than a GSR test could provide.
[Footnote 11.]

> [Footnote 11: Marusin considers GSR testing inconclusive because it
> shows at most that the person or item tested was in the environment where
> a gun was fired.  It is "old technology" which his department no longer
> uses very often.  He believed it was done on certain people "just for drill
> more than anything else."  Criminalist and firearms expert Don Dunbar
> testified that the Department of Justice no longer uses GSR testing because
> it is not very reliable: it can produce both false negatives and false
> positives.]

Michael Daehn testified that he did not get along with Marisol's father and that
most people did not like him.  Marisol took the money from the house without
telling Daehn in advance; he had never told anyone of a plan to steal from her
father.  Once she told him she had stolen the money, they created a cover story
together.

Marisol admitted that this was not the first time she had stolen from her father, but
the amounts had been much less before.  He neglected her basic needs: he had not
bought her clothing since she turned 16 or food since she turned 17, and he had
laughed at her many times when she asked for money.  She had told some of her
friends about that.  However, she claimed she had a good and loving relationship
with her father.  She also claimed a loving relationship with her uncle, although
they had had an argument a week before the crimes.  She denied that the had tried
to rape her or that she had told anyone he did.

Crystal Barden testified that Marisol said on March 17, 1998, that she had round
$4500 or $5000, planned to take it, and intended to tell her father a cover story
about a burglary.  Marisol also said that within the last couple of weeks her uncle
had come at her (although she did not use the word rape).

Tony Burgos testified that Daehn said before March 18 that he and Marisol were
planning to take money from her father.

Four eyewitnesses reported that they had seen a Hispanic man running from the
scene; they saw him at several different locations.  Sergeant Marusin believed,
however, that three of the reports described the same person and the fourth
described a person unconnected to these crimes.

One of these eyewitnesses , Robert Haldeman, was the person to whose house Marisol had come to call 911.  He was out walking in the neighborhood with his girlfriend between 9:30 o'clock and 10:30 o'clock on the night of the crimes. They first saw a man in black clothes walking along the bushes, then saw him again about 10:25 p.m. jogging in the opposite direction.  He appeared around 5 feet 10 inches tall, 160 to 170 pounds, 25 to 30 years old, and African American or Hispanic; his skin color was similar to that in a photo of codefendant Lampkin. When interviewed by the police, Haldeman had described the man as looking Hispanic or Asian.

Joseph Leon, who used the "rap name" Leon Kage, testified that he was a good friend of defendant and that they had performed rap music together.  He had suffered a conviction for robbery in 1994.  He would tell a "little lie" for defendant, but not "something major."

On March 18, 1998, Leon was in Daly City, California, on a job. [Footnote 12.]

> [Footnote 12: He stayed in a motel, which he had named in an interview with Sergeant Marusin.  Now, however, he could not recall the name.]

He called defendant between 6:00 p.m. and 7:00 p.m. to talk about a barbeque planned for the weekend.  He called twice.  The second time a woman answered and turned over the phone to defendant; they talked for several minutes.  He did not ask defendant to come and pick him up. [Footnote 13]

> [Footnote 13: As mentioned above, Maurita Gilmer, who knew Leon, testified that he was not the caller.]

Over defense objection, Leon was asked on cross-examination about defendant's knowledge of firearms.  He testified that he had seen defendant with a gun in December 1997, and that defendant sometimes sold guns; he had offered to sell one to Leon.  When shown a photograph of himself and defendant with a sawed-off shotgun, also over defense objection, he explained that the photo was taken in 1992 as a promotional shot for a rap album; he also pointed out that he was the one holding the gun, not defendant.

Mark Cox testified that he had bought several guns from defendant, including a nine-millimeter Ruger in January 1998.  He sold it within a couple of days to a Laotian named Sam.  There was no paperwork involved in these transactions. Like Joseph Leon, Cox would tell a "little lie" for defendant, but not a big one.

Daniel Joseph, a defense firearms expert, examined the crime scene and photographs of the scene. [Footnote 14.] Based on the physical evidence and on

> [Footnote 14: Defendant asserts that Joseph also testified as an expert in "shooting reconstruction."  However, defendant's record citation does not support his implicit claim that Joseph qualified as an expert in that broad field.  At the page cited ,the trial court stated only that Joseph was qualified to testify about "the characteristics of handguns," including "the ejecting patterns of certain handguns."]

11

certain assumptions about the trajectories of the bullets fired, he concluded that a shooter firing a nine-millimeter pistol had entered the house in a crouch from the garage, taking the occupants by surprise.  If Alejandro, sitting at the kitchen table, had been caught unawares in this manner, Leoncio, who was in the living room, might have been unsure about the source of the firing and thought mistakenly that it was coming from the front.  Trying to return fire, he could have shot through the front door as he moved across to the kitchen.  The locations of the .45 caliber from the living room, not the dining room.  If the front door was open, there was a line of sight to the end of the driveway form a range of positions in the living room.  This scenario would be impossible only if the front door had been locked before shots were fired, since there were not bullet holes in that door.  Joseph also opined that it was very unlikely that anyone shot three times with a .45 caliber from within 15 feet would not go down quickly.

Rebuttal.

The prosecution recalled Don Dunbar, its firearms expert, to respond to Joseph's testimony.  After that testimony, Dunbar examined the crime scene and took measurements to determine the positions from which shots could have been fired from inside the house through an open front door without hitting anything inside.  He concluded that from the most favorable position, with the door open 11 inches, there would have been a four-foot-wide expanse visible at the driveway; from the least favorable position, with the door open only two inches, there would have been an expanse at the driveway of less than eight inches.  If the door was closed, shots could not have been fired from inside the house because there were no bullets or bullet holes in the door.

Opinion of California Court of Appeal, Respondent's Lodged Document 1, pp. 3-18.

IV.  Discussion

      A.  Jury Instruction Error

      *Legal Standard*

      A challenge to jury instructions does not generally state a federal constitutional claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in

12

1   the state trial proceedings to reach the level of a due process violation, the error had to be one

2   involving "fundamental fairness." Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined

3   the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct.

4   at 482.

5           Where, as in the present case, what is at issue is the failure to give an instruction,

6   petitioner's burden is "especially heavy" because it has been held that "[a]n omission or an

7   incomplete instruction is less likely to be prejudicial than a misstatement of the law." Henderson

8   v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).  Moreover, a trial judge need not

9   instruct on a defense which would be inconsistent with petitioner's theory of the case. Bashor v.

10   Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).  Failure to give a jury instruction under these

11   circumstances will not amount to a due process violation.  Id.

12           The burden upon petitioner is greater yet in a situation where he claims that the

13   trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

14   duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

15   claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

16   Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

17   claim whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to

18   violate due process, the impact on the proceeding from failure to give an instruction sua sponte

19   must be of a very substantial magnitude.

20           Furthermore, the Supreme Court has recently held that there is no unreasonable

21   application of federal law where a state appellate court decided that a jury instruction's single

22   incorrect statement of the "imperfect self-defense" standard did not render the instruction

23   reasonably likely to have misled the jury.  Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830

24   (2004).

25   /////

26   /////

13

1        *Analysis*

2                Petitioner argues that the trial court violated his right to due process by failing to

3        instruct on third party culpability.  The California Court of Appeal denied this claim as follows:

4                Defendant contends the trial court erred prejudicially by failing to instruct the jury
                 on third-party culpability.  Acknowledging that his counsel did not request such
5                an instruction, he argues in the alternative that counsel was ineffective for failing
                 to do so.  We reject these contentions.

6
                 Instruction on third-party culpability is required only where direct or
7                circumstantial evidence links someone other than the defendant to the perpetration
                 of the crime and suffices to raise a reasonable doubt as to the defendant's guilt.
8                (People v. Bradford (1997) 15 Cal.4th 1229, 1325; People v. Hall (1986) 41
                 Cal.3d 826, 833.)

9
                 So far as defendant means to suggest that the third party was codefendant
10               Lampkin, the evidence pointing to the codefendant did not raise a reasonable
                 doubt as to defendant's guilt, since much of it directly implicated defendant.

11
                 So far as defendant means to suggest, however, that someone other than
12               codefendant was the culpable third party, he fails to support that suggestion.  As at
                 trial, he speculates about alternative perpetrators ranging from Marisol Jiminez
13               and her boyfriend to unknown persons in the drug trade, but cites no evidence that
                 any such persons were actually linked to the crimes.  Mere speculation about the
14               possible motives or opportunities of third persons, without more, does not justify
                 instruction on third party culpability.  (People v. Hall, supra, 41 Cal.3d at p. 833.)

15
                 Since there was no substantial evidence to support an instruction on third-party
16               culpability as to anyone other than codefendant, the trial court had no duty to
                 instruct sua sponte on that theory.  (See People v. Flannel (1979) 25 Cal.3d 668,
17               680-681.)  For that same reason, trial counsel was not ineffective for failing to
                 request that instruction.

18

19       Opinion of California Court of Appeal, Respondent's Lodged Document 1, pp. 18-19.

20               For the reasons stated by the California Court of Appeal the court finds that the

21       trial court's failure to sua sponte instruct the jury as to third party culpability did not involve a

22       violation of fundamental fairness.  In the amended petition, petitioner states that the investigation

23       as to this claim is ongoing.  Petitioner states that further facts will be presented following further

24       investigation or an evidentiary hearing.  Petitioner has presented no facts nor requested an

25       \\\\\

26       \\\\\

1    evidentiary hearing.[1]  Because the denial of this claim by the California Court of Appeal was not

2    an unreasonable application of clearly established Supreme Court authority, this claim should be

3    denied.

4           Petitioner also argues that the trial court's failure to instruct the jury as to third

5    party culpability violated his right to present a defense.  No reasoned state court opinion

6    addresses this claim.  Under the Due Process Clause of the Fourteenth Amendment, criminal

7    prosecutions must comport with prevailing notions of fundamental fairness.  We have long

8    interpreted this standard of fairness to require that criminal defendants be afforded a meaningful

9    opportunity to present a complete defense.  California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct.

10   2528 (1984).  The Supreme Court has also held that "[a]s a general proposition, a defendant is

11   entitled to an instruction as to any recognized defense for which there exists evidence sufficient

12   for a reasonable jury to find in his favor."  Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct.

13   883 (1988).

14          Because petitioner's lawyer did not request an instruction regarding third party

15   culpability, petitioner cannot argue that the trial court denied him his right to present a defense.

16   In any event, as found by the California Court of Appeal, there was not sufficient evidence to

17   support such an instruction.  After independently reviewing the record, the court finds that the

18   denial of this claim by the California Supreme Court was not an unreasonable application of

19   clearly established Supreme Court authority.  Accordingly, this claim should be denied.

20          B.  Improper Admission of Character Evidence

21          Petitioner argues that the trial court improperly admitted evidence of petitioner's

22   financial problems and a photograph depicting him with a gun unrelated to the at-issue offenses.

23   /////

24

25          [1]  In his traverse, petitioner states that a request for an evidentiary hearing is forthcoming.
     Petitioner did not request an evidentiary hearing following the filing of his traverse on November
26   28, 2005.

1     *Legal Standard*

2         A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis

3     of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d

4     1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

5     unavailable for alleged error in the interpretation or application of state law.  Middleton v. Cupp,

6     768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

7     Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state

8     issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

9         The Supreme Court has reiterated the standards of review for a federal habeas

10    court.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).  In Estelle v. McGuire, the

11    Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

12    granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

13    evidence was incorrectly admitted under state law since, "it is not the province of a federal

14    habeas court to reexamine state court determinations on state law questions."  Id. at 67-68, 112 S.

15    Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

16    state law."  Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

17    3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

18    may not grant habeas relief where the sole ground presented involves a perceived error of state

19    law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

20    Protection clauses of the Fourteenth Amendment).

21        The Supreme Court further noted that the standard of review for a federal habeas

22    court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

23    the United States (citations omitted)."  Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

24    order for error in the state trial proceedings to reach the level of a due process violation, the error

25    had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

26    defined the category of infractions that violate "fundamental fairness" very narrowly.'"  Id. at 73,

1   112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

2   or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp,

3   926 F.2d 918, 919 (9th Cir. 1991).  Moreover, any lack of "fundamental fairness" is not

4   determined de novo, but only determined if fairly specific Supreme Court authority had so

5   designated such a situation prior to the finality of petitioner's conviction.

6           *Discussion*

7           The California Court of Appeal rejected petitioner's claim regarding admission of

8   the photograph on the following grounds:

9           Defendant contends the trial court erred prejudicially by admitting the photograph
            of himself and Joseph Leon, who was holding a shotgun, over his objection.  We
10          conclude that any error was harmless.

11          Defendant asserts the photograph was irrelevant and highly prejudicial character
            evidence whose introduction deprived him of a fair trial under the due process
12          clause of the United States and California Constitutions.  Assuming that these
            contentions are properly before us despite defendant's failure to show by record
13          citation that he raised these grounds for his objection, we see no deprivation of a
            fair trial or due process.  (See People v. Cudjo (1993) 6 Cal.4th 585, 610-612, see
14          also People v. Kraft (2000) 23 Cal.4th 978, 1035.)

15          Assuming for the sake of argument the photograph was erroneously admitted,
            defendant can show no prejudice.
16
            Thus, in the photograph, defendant was not holding the shotgun, Leon was.  Even
17          assuming that evidence of defendant's familiarity with guns might have had some
            tendency to prejudice him, defendant himself put on far more damaging evidence
18          on this point: Leon himself testified that defendant regularly sold guns, and Mark
            Cox testified that he had personally bought three guns from defendant.
19          Furthermore, it was undisputed that defendant enlisted Melanie Tugend and
            Maurita Gilmer to act as straw buyers for him in purchasing the Ruger nine-
20          millimeter pistol that killed the victims.  Thus, even if the photograph at issue had
            a potential for prejudice that outweighed its probative effect, that potential was de
21          minimis in light of the other undisputed evidence of defendant's involvement with
            guns.
22
            Moreover, the case against defendant was very strong.  The firearms evidence tied
23          him directly to the killing, he owned the backpacks which were found full of
            incriminating evidence outside the victims' house, he owned and had sole access
24          to the locked file cabinet at Charlene Harden's residence which contained further
            incriminating evidence, he received a call from "Leon" and said he was going to
25          go pick him up a few hours before the killing, he was seen later in the evening
            driving with a passenger whose description corresponded to codefendant's, he
26          went into the locked file cabinet at Harden's residence carrying a backpack and

                                        17

1   removed something before leaving, he parked his parents' Cadillac in a driveway
2   near the victims' house but not visible from it shortly before the crimes, his gun
    was found at the crime scene, and when found on the street just after the crimes,
3   he would not tell the officers how he came to be there.  His defense depended on
    the claim that he was simply walking by the victims' house and got shot through
4   the open door, but (1) Marisol Jimenez testified that someone inside the house
    closed the door before the shooting began; 2) the first officer to reach the house
5   after the shootings found the door locked; 3) there were no bullets or bullet holes
    in the door; 4) it defied common sense that anyone inside a house where a gun
6   battle was raging would take the time to fire at an innocent passerby outside the
    house; 5) defendant's gun was found at the crime scene; and 6) it was never
7   explained why defendant would have been walking by the victims' house at that
    moment for any innocent reason.  Thus, even if we assumed the trial court abused
8   its discretion by admitting the photograph, defendant can show no prejudice from
    its admission because it is not reasonably probable defendant would have
9   achieved a more favorable result had the photograph been excluded.  (People v.
    Cudjo, supra, 6 Cal.4th at pp. 610-612.)

10  Opinion of California Court of Appeal, Respondent's Lodged Document 1, pp. 20-22.

11          First, the Supreme Court has not found that the admission of propensity evidence

12  is a matter of fundamental unfairness, and its preclusion a matter of Constitutional import.  As

13  such, petitioner's argument fails in this federal habeas context.  Alberni v.McDaniel, 458 F.3d

14  860, 864 (9th Cir. 2006).

15          Secondly, for the reasons stated by the California Court of Appeal, the court finds

16  that admission of the photograph did not violate fundamental fairness.  Because the denial of this

17  claim by the California Court of Appeal was not an unreasonable application of clearly

18  established Supreme Court authority, this claim should be denied.

19          The California Court of Appeal also rejected petitioner's claim challenging

20  admission of evidence regarding his financial problems:

21          Defendant contends the trial court erred prejudicially by permitting Maurita
            Gilmer and defendant's landlady Shirley Zeller to testify that defendant and
22          Gilmer had trouble paying their rent because it is impermissible to use evidence of
            a defendant's poverty to show his motive for committing theft or robbery.
23          Assuming it was error to admit the evidence, once again, we see no prejudice.

24          Evidence of a defendant's poverty to show a motive for theft or robbery is
            generally barred because reliance on poverty alone is considered unfair to the
25          defendant and the prejudicial value of such evidence usually outweighs its
            probative effect.  (People v. Wilson (1992) 3 Cal.4th 926, 939; People v.
26          Edelbacher (1989) 47 Cal.3d 983, 1024; People v. Hogan (1982) 31 Cal.3d 815,

854.)  Any error in admitting the evidence is necessarily harmless for the reasons
stated above in part II.  Since the evidence aside from motive pointed so strongly
to defendant, and the prosecution did not need to prove motive in any event, there
is no reasonable probability that defendant would have obtained a better outcome
had the evidence of his late rent payments been excluded.  (People v. Cudjo,
supra, 6 Cal.4th at pp. 610-612.)

Opinion of California Court of Appeal, Respondent's Lodged Document 1, pp. 22-23.

For the reasons stated by the California Court of Appeal, the court finds that
admission of the evidence regarding petitioner's financial problems did not violate fundamental
fairness.  Because the denial of this claim by the California Court of Appeal was not an
unreasonable application of clearly established Supreme Court authority, this claim should be
denied.

C.  Ineffective Assistance of Counsel

*Legal Standard*

The test for demonstrating ineffective assistance of counsel is set forth in
Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show
that, considering all the circumstances, counsel's performance fell below an objective standard of
reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must
identify the acts or omissions that are alleged not to have been the result of reasonable
professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine
whether in light of all the circumstances, the identified acts or omissions were outside the wide
range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that
counsel's conduct was within the wide range of reasonable assistance, and that he exercised
acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d
695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at
693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

confidence in the outcome."  Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated

based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference

to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

*Analysis*

Petitioner first argues that he was constructively denied the effective assistance of

counsel because his counsel was subject to disciplinary proceedings by the California State Bar.

On April 29, 1998, petitioner's counsel, Mr. Meyer, was suspended from the practice of law for

six months and placed on probation for two years by the California State Bar.  Amended Petition,

Exhibit C.  This disciplinary action was based on counsel's conduct in civil actions in which he

failed to promptly returned money owed to a client and keep adequate records, filed an

20

1   unwarranted claim in state court and failed to pay sanctions, and failed to communicate with a

2   client regarding her decision not to file a lawsuit. Id.  On January 20, 2000, petitioner's counsel

3   resigned from membership in the State Bar. Id.  At that time, further disciplinary proceedings

4   were pending against him. Id.

5          In Young v. Runnels, 435 F.3d 1038, 1043 (9th Cir. 2006) the Ninth Circuit found

6   that merely because defense counsel is subject to disciplinary proceedings while representing a

7   client does not mean that he is presumptively incapable of providing effective assistance.  Even

8   in a case where counsel was disciplined mid-trial but continued to represent the client, counsel's

9   conduct was governed by the standards set forth in Strickland, supra.  Young v. Runnels, 435

10  F.3d at 1043, citing United States v. Mouzin, 785 F.2d 682 (9th Cir. 1986).  Accordingly, the

11  court does not find that Mr. Meyer was per se ineffective based on the disciplinary proceedings

12  against him in the California State Bar.

13         Petitioner next argues that his counsel was ineffective for arguing third party

14  culpability but then failing to request that the jury be instructed on this defense.  As discussed

15  above, the California Court of Appeal found that there was not sufficient evidence to warrant this

16  instruction.  The court agrees with this reasoning.  Petitioner argues that had counsel properly

17  investigated the case he would have found evidence to support the third party culpability defense

18  and instruction.  However, petitioner offers no evidence to support this speculation.

19  Accordingly, the court does not find that petitioner was prejudiced by his counsel's failure to

20  request an instruction regarding third party culpability.

21         Petitioner next argues that his counsel was ineffective because he went into trial

22  poorly prepared without adequate investigation into the facts of the case.  In particular, petitioner

23  argues that the trial court authorized his counsel to hire expert witnesses, a forensic pathologist

24  and a ballistics expert.  Petitioner argues that counsel did not hire a forensic pathologist and that

25  the ballistics expert hired by counsel was found to be unqualified.

26  \\\\\

1    Petitioner provides no evidence or argument regarding what testimony a forensic

2    pathologist could have provided that would have testified to.  Nor does petitioner identify any of

3    the other expert witnesses counsel failed to hire.  For these reasons, the court finds that petitioner

4    has not demonstrated a reasonable probability that, but for counsel's failure to call a forensic

5    pathologist and other unidentified experts, the result of the proceeding would have been different.

6    While petitioner's ballistics expert was found to be unqualified to give his opinion

7    on crime scene reconstruction, petitioner does not discuss what the ballistic expert's testimony

8    would have been and how it would have aided the defense.  Without this information, the court

9    cannot determine whether the outcome of the proceeding would have been different had

10   petitioner's counsel called a qualified ballistic's expert.

11   Petitioner next argues that his counsel was ineffective for failing to call witnesses

12   who saw another suspect running from the scene.  Petitioner states that his counsel claimed that

13   two of the witnesses were unavailable because they had left the state and another was

14   uncooperative because he did not speak English.  Petitioner claims that these witnesses stated

15   that they saw a Hispanic male, approximately 5'11" running from the scene in a different location

16   than Lampkin.  Petitioner argues that this unknown individual matched the description given by

17   Marisol Jimenez of the man holding the gun to her uncle's head.

18   Petitioner is claiming that his counsel failed to adequately investigate whether a

19   third party was involved.  The problem with this argument is that petitioner has still presented no

20   evidence to support his claim of third party liability.  Nor has petitioner requested an evidentiary

21   hearing as to this claim.  In any event, as discussed above, the evidence against petitioner was

22   strong.  Evidence that a third party was present at the scene does not diminish petitioner's

23   liability.  In addition, petitioner concedes that counsel attempted to but was unable to locate these

24   witnesses.  For these reasons, the court finds that petitioner has failed to meet his burden of

25   demonstrating either of the Strickland prongs, i.e. prejudice or that counsel acted unreasonably.

26   \\\\\

1    Finally, petitioner argues that the defense theory argued by counsel, i.e. that

2    petitioner was shot when he just happened to be walking by the crime scene, was unsupported.

3    Petitioner argues that his counsel should have argued that petitioner was involved in a drug scene

4    that erupted in violence.  The fact that the victims had large amounts of cash in their pockets

5    suggested that they had just received the money for drugs.  Petitioner argues that had counsel

6    argued this theory of the case, which was supported by substantial evidence, it is reasonably

7    probable that he would have been convicted of second degree felony murder.

8    The court agrees that the defense argued by counsel was weak and unsupported by

9    the evidence.  A defense that petitioner was involved in a drug deal gone bad was more plausible.

10   However, the evidence supporting the burglary and robbery special circumstances, which

11   resulted in the first degree murder conviction, was strong.  Evidence was presented from which a

12   jury could reasonably infer that petitioner and Limpkin were made aware that drugs and large

13   amounts of cash were in the victims' residence.  Backpacks resembling packs belonging to

14   petitioner were found near the scene.  These packs contained duct tape, shotgun shells, a

15   magazine with a live round and a glove containing petitioner's fingerprints.  Based on the

16   contents of these backpacks, a jury could reasonably infer that petitioner intended to burglarize

17   and/or rob the victims.  If petitioner merely intended to buy drugs from the victims, it is unclear

18   why these materials were at the scene.  That petitioner parked his parents car at a nearby house

19   that was not visible from the crime scene also supports the inference that he intended to rob the

20   victims rather than buy drugs.

21   In sum, there really was no good defense.  The evidence against him was strong.

22   For these reasons, the court does not find that he was prejudiced by counsel's failure to pursue a

23   defense based on a drug deal gone bad.

24   The denial of petitioner's ineffective assistance of counsel claims by the Superior

25   Court was not an unreasonable application of clearly established Supreme Court authority.

26   Accordingly, these claims should be denied.

1    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

2 a writ of habeas corpus be denied.

3    These findings and recommendations are submitted to the United States District

4 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5 days after being served with these findings and recommendations, any party may file written

6 objections with the court and serve a copy on all parties.  Such a document should be captioned

7 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8 shall be served and filed within ten days after service of the objections.  The parties are advised

9 that failure to file objections within the specified time may waive the right to appeal the District

10 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11 DATED: 11/7/06

12                                                           /s/ Gregory G. Hollows

13                                                           _____
                                                             GREGORY G. HOLLOWS
14                                                           UNITED STATES MAGISTRATE JUDGE

15 owen2415.157

16

17

18

19

20

21

22

23

24

25

26